UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BETTY M. ALEXIDOR,

                             Plaintiff,

         -v-

PATRICK R. DONAHOE, Postmaster General,

                             Defendant.

Case No. 11-CV-9113 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Betty M. Alexidor
Bronx, NY
*Pro Se Plaintiff*

Brandon H. Cowart, Esq.
U.S. Attorney's Office, S.D.N.Y.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiff Betty M. Alexidor ("Plaintiff"), proceeding pro se, brings this Action against

Patrick R. Donahoe, Postmaster General ("Defendant"), alleging that the United States Postal

Service ("USPS") discriminated against her on the basis of her disability, race, sex, and national

origin, and retaliated against her, all in violation of Title VII of the Civil Rights Act of 1964, as

codified, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act, as codified, 42

U.S.C. §§ 12112–12117.[1]  Defendant moves for summary judgment pursuant to Rule 56 (the

"Motion").  (*See* Dkt. No. 78.)  For the reasons stated below, the Motion is granted.

---

[1] Plaintiff names the United States Postal Service ("USPS") as the defendant in this
Action.  However, "[t]he proper defendant in a Title VII case brought by a USPS employee is the
Postmaster General."  *Mathirampuzha v. Potter*, 371 F. Supp. 2d 159, 163 (E.D.N.Y. 2005)

## I.  Background

### A.  Factual Background

Plaintiff is an African-American woman who began working for the United States Postal

Service ("USPS") on February 24, 2001.  (Def.'s Local Rule 56.1 Statement of Undisputed Facts

("Def.'s 56.1") ¶¶ 1, 4 (Dkt. No. 83); Aff'n in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s 56.1")

¶¶ 1, 4 (Dkt. No. 87); *see also* Decl. of Brandon Cowart ("Cowart Decl.") Ex. 2 ("Pl.'s EEO

Aff.") at D0278 (Dkt. No. 81).)[2]  Plaintiff was employed as a "City Letter Carrier" until 2008,

was stationed at the Greystone Carrier Annex Post Office, a subsidiary station of the Yonkers

---

(citing 42 U.S.C. § 2000e-16(c)); *see also Tulin v. U.S. Postal Service*, No. 06-CV-5067, 2008 WL 822126, at *4 (E.D.N.Y. Mar. 25, 2008) (noting that the proper defendant in an action pursuant to Title VII "is the head of the federal agency in which the allegedly discriminatory actions occurred; in this case, John E. Potter, Postmaster General").  "The same procedural requirements apply to suits alleging employment discrimination pursuant to the Rehabilitation Act." *Jaremka v. U.S. Gov't Dep't Veterans Affairs*, No. 05-CV-367, 2007 WL 2580493, at *1 (W.D.N.Y. Sept. 4, 2007).  Further, the agency's employees "are not subject to suit under Title VII or the Rehabilitation Act." *Id.*; *see also Thomas v. Dep't of Veterans Affairs*, No. 05-CV-5348, 2006 WL 1636738, at *6 (S.D.N.Y. Apr. 3, 2006) ("[The named] [d]efendants[,] the VA and its employees, . . . are not subject to suit under the Rehabilitation Act."), *adopted by* 2006 WL 1594481 (S.D.N.Y. June 6, 2006).  Thus, claims brought against Robert Cobelli, S. Berrientos, Anthony Disanzo, Patrick O'Connor, and C. Jean Breyer, all USPS employees, are dismissed.  For the same reason, claims against the remaining named defendants, Gita Persaud, Zev Sapir, and Mary Ann Taylor are also dismissed.  Substitution of those individuals' employers, the Office of Federal Workers' Compensation and the Office of Inspector General, would still result in dismissal because Plaintiff does not allege she was employed by either agency.  *See Smolyn v. Tyco Integrated Sec. LLC*, No. 14-CV-56, 2016 WL 4120325, at *8 (N.D.N.Y. July 28, 2016) ("An employer-employee relationship is a required element of an employment discrimination claim under Title VII."); *see also Heller v. Consol. Rail Corp.*, 331 F. App'x 766, 768 (2d Cir. 2009) ("Additionally, as appellant did not allege that either the EEOC or the Railroad Retirement Board was his employer, he could not state a claim against them under the provisions of Title VII . . . which apply only to discriminatory practices by an employer.").

    [2] The entirety of Plaintiff's filing in opposition to the instant Motion was a document entitled "Affirmation in Opposition to Defendant[']s Motion for Summary Judgment," which contained responses to Defendant's Rule 56.1 Statement and attached a number of exhibits.  (*See* Pl.'s 56.1.)

Main Post Office, and was assigned mail delivery Route 40.  (Def.'s 56.1 ¶¶ 1–2; Pl.'s 56.1 ¶¶ 1–2; *see also* Cowart Decl. Ex. 42 ("2011 EEO Complaint") at D0098.)

Plaintiff suffered an on-the-job injury that resulted in her taking disability leave beginning July 17, 2008.  (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.)  According to her U.S. Department of Labor Work Capacity Evaluation, dated April 13, 2010, Plaintiff suffered from a "low back and cervical strain," but she could return to her job with certain restrictions and limitations.  (Pl.'s 56.1 ¶ 6; Cowart Decl. Ex. 35 ("Medical Evaluation").)  Specifically, Plaintiff:  (1) was limited to working four to six hours per day; (2) could sit, walk, or stand for up to six hours a day; (3) could push, pull, or lift up to 25 pounds but for only four to six hours a day; and (4) required 15-minute breaks every two to three hours.  (Medical Evaluation at D0660.)  The evaluation noted that Plaintiff "initially [could] return to work with a pullcart for four hours per day and, if tolerated, that [could] be increased to six hours."  (*Id.* at D0661.)

On September 28, 2010, USPS provided Plaintiff with an "Offer of Modified Assignment (Limited Duty)."  (*See* Cowart Decl. Ex. 36.)  The offer would allow Plaintiff to remain as a city letter carrier, but with a number of adjustments.  (*Id.* at D0986.)  Specifically, Plaintiff's work hours would be 10:00 A.M. to 2:00 P.M.; a maximum of four hours of lifting, pushing, pulling, twisting, or bending; no repetitive lifting, pushing, or pulling over 25 pounds; the use of a push cart for deliveries; and a 15-minute break every two to three hours.  (*Id.*; *see also* Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.)  Plaintiff accepted the Offer of Modified Assignment on September 28, 2010.  (Cowart Decl. Ex. 36; Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.)  Despite her acceptance of the offer, Plaintiff stopped reporting for her scheduled work shifts on November 20, 2010, and was marked variously as being either on unauthorized Leave Without Pay status or unauthorized Absence

Without Leave status from that point forward.  (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12; Cowart Decl. Ex. 37 at D0528–D0531.)[3]

In November 2010, Plaintiff attempted to obtain a letter stating that she was in good standing, (the "Good Standing Letter"), and she was directed to Postmaster Robert Cobelli ("Cobelli") for that purpose.  (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.)  On November 29, 2010, Plaintiff went to Greystone Station to attempt to get the Good Standing Letter.  (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.)  Plaintiff demanded that Cobelli prepare the Good Standing Letter addressed "To Whom it May Concern," disclosing information about her employment status with USPS. (Decl. of Robert R. Cobelli ("Cobelli Decl.") ¶ 2 (Dkt. No. 80).)  Cobelli attests that he refused to give Plaintiff the Good Standing Letter because he needed additional information about the request before he would consider disclosing employment information in a letter addressed to an unknown party, and because Plaintiff had "poor attendance in the two weeks prior to her making the request."  (Id. ¶¶ 2, 6.)[4]  Plaintiff does not dispute that she began to "shout and yell at . . . Cobelli" in the presence of other employees, that she was instructed to leave, and that the police were called to remove her from the premises.  (Def.'s 56.1 ¶¶ 15–16; Pl.'s 56.1 ¶¶ 15–16.)

On February 25, 2011, her then-supervisor Patrick O'Connor ("O'Connor") sent Plaintiff a letter noting that she had been "continuously absent without approved leave (AWOL) from

[3] According to Patrick O'Connor, the then-supervisor of Plaintiff, the classifications of Plaintiff's absence as Leave Without Pay on November 20, 22, 24, 26, and 27 "should have been" classified as Absence Without Leave, but, regardless, "an unscheduled absence has negative consequences for Postal Service operations."  (Decl. of Patrick J. O'Connor ¶¶ 6, 9–10 (Dkt. No. 79).)

[4] Plaintiff does not dispute that Cobelli refused to give her the Good Standing Letter "because [her] records were not in good standing," but she asserts that the records were "manipulat[ed]" by O'Connor "with different finance numbers, which left [her] initial submission of her PS form 50 to the Federal Employee Education and Assistance Fund needing more information."  (Pl.'s 56.1 ¶ 14.)

duty since November 30, 2010." (Cowart Decl. Ex. 10; *see also* Def.'s 56.1 ¶ 17; Pl.'s 56.1

¶ 17.) The letter directed Plaintiff to report for duty immediately or to submit satisfactory

evidence substantiating her absence. (Cowart Decl. Ex. 10.) Three days later, Plaintiff went to

Greystone Station where she had a verbal dispute with Cobelli, who called the Yonkers Police to

escort Plaintiff from the facility. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.) Ultimately, Plaintiff

returned to duty on March 10, 2011. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19; Pl.'s EEO Aff. at D0292.)

Plaintiff does not dispute that on March 30, 2011, after reporting for work at Greystone

Station, she "began to yell derogatory remarks and obscenities at . . . O'Connor on the workroom

floor," including that O'Connor "had spent a lot of [sic] companies time and money to get

[Plaintiff] the way he want," and that she "was his slave whore" and "was here to service him, to

get it up." (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) She refused to leave the building or stop yelling,

despite being directed to do so by O'Connor. (Def.'s 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) Plaintiff was

told she was being put on emergency off-duty status because of her behavior and that she must

leave the building. (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22.)[5] She refused to leave and continued to

yell at O'Connor, until police officers eventually removed her from the premises. (Def.'s 56.1

¶¶ 23–24; Pl.'s 56.1 ¶¶ 23–24.) Despite her emergency off-duty status, Plaintiff attempted to

clock in to her shift at Greystone Station on April 1, 2011, but was stopped by O'Connor before

she entered. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) Plaintiff refused to leave and instead tried to

enter the building and clock in. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) For the fourth time, police

---

[5] According to the USPS Letter Carrier National Agreement, "[a]n employee may be
immediately placed on an off-duty status (without pay) by the Employer . . . where retaining the
employee on duty may result in damage to U.S. Postal Service property, loss of mail or funds, or
where the employee may be injurious to self or others." (Cowart Decl. Ex. 40 at D0895–D0896;
*see also* Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22.)

officers were called to Greystone Station to remove Plaintiff from the premises.  (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.)

Plaintiff was issued a Notice of Removal letter (the "Notice") on April 26, 2011.  (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 27; Cowart Decl. Ex. 21.)  The Notice charged Plaintiff with (1) "Unacceptable Conduct" based on the March 30, 2011 incident, which the Notice asserted violated multiple sections of the Employee & Labor Relations Manual, including one prohibiting violent and/or threatening behavior, and (2) "Unauthorized entry into a postal facility" based on the April 1, 2011 incident, which the Notice asserted violated the section of the Employee & Labor Relations Manual requiring obedience to orders of supervisors.  (*See generally* Cowart Decl. Ex. 21.)

### B.  Procedural Background

Plaintiff filed an Equal Employment Opportunity ("EEO") Complaint of Discrimination on April 18, 2011.  (*See* 2011 EEO Complaint.)  The EEO Complaint alleges that Plaintiff was given "unreasonable accommodations and improper restoration by . . . O'Conn[o]r" and that he "failed to return credits for seniority."  (*Id.*)  On May 20, 2011, Plaintiff's EEO Complaint was amended to add a challenge to the Notice of Removal.  (Cowart Decl. Ex. 1 at D0269.)  Plaintiff commenced this Action with the filing of her Complaint on December 13, 2011.  (*See* Dkt. No. 2.)  On January 29, 2013, Plaintiff's case, with regard to the claims against USPS, was stayed in light of ongoing criminal proceedings involving Plaintiff.  (*See* Dkt. No. 36.)  Despite the stay, on March 18, 2013, Plaintiff asked the Court for a preliminary injunction ordering Plaintiff's reinstatement and receipt of back pay, and the Court denied her request on May 17, 2013.  (*See* Dkt. No. 48; *see also* Dkt. No. 45.)  The stay was lifted on December 24, 2014, (*see* Dkt. No. 57), and Defendant filed an answer to the Complaint on March 5, 2015, (*see* Dkt. No. 59).

Pursuant to a Scheduling Order issued on October 30, 2015, (*see* Dkt. No. 71), Defendant filed

the instant Motion and accompanying papers on January 19, 2016, (*see* Dkt. Nos. 78–84),

Plaintiff filed papers in opposition on February 23, 2016, (*see* Dkt. No. 87; *see also* Dkt. No. 91),

and Defendant filed reply papers on March 15, 2016, (*see* Dkt. Nos. 88–89).[6]

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

---

[6] The Court notes that, on September 29, 2016, Defendant filed amended materials in support of the Motion, consisting of corrected citations and additional pages of an exhibit.  (*See* Dkt. Nos. 92–94.)

of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that [her] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May

24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally"
and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau
of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).

B.  Analysis

Plaintiff appears to assert claims for discrimination on the basis of her disability, race,
national origin, sex, and in retaliation for her prior EEO activity.  More specifically, she
complains that she was denied a reasonable accommodation upon her return to work, and was
discriminatorily denied a Good Standing Letter, prevented from returning to her pre-injury route,
and terminated.

1.  Disability Discrimination Claim

Although Plaintiff's Complaint invokes the Americans with Disabilities Act ("ADA"), as
a federal employee, Plaintiff's claim "for discrimination based upon a disability is governed by
[§] 501 of the Rehabilitation Act."  *Verdi v. Potter*, No. 08-CV-2687, 2010 WL 502959, at *4
(E.D.N.Y. Feb. 9, 2010); *see also Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("As a
federal employee . . . [the plaintiff's] sole claim for discrimination on the basis of disability is
under the Rehabilitation Act, if anywhere."); *Lamphear v. Potter*, No. 09-CV-1640, 2012 WL
3043108, at *2 (D. Conn. July 25, 2012) ("Thus, the ADA specifically excludes the federal
government, including the USPS, in its capacity as employer, from its coverage.").  To determine
whether an employer has violated the Rehabilitation Act, however, "courts use the standards set
forth in the ADA."  *Atencio v. U.S. Postal Serv.*, No. 14-CV-7929, 2015 WL 7308664, at *5
(S.D.N.Y. Nov. 19, 2015) (alteration and internal quotation marks omitted).

Plaintiff's various filings in this case repeatedly refer to an "unreasonable
accommodation" and "improper restoration" when she returned to work following her injury.

9

(*See, e.g.*, Compl. for Employment Discrimination ("Compl.") 4 (listing as facts of her case on form discrimination complaint "unreasonable accommodations" and "improper restorations") (Dkt. No. 2); *id.* at 16 ("I was [u]nreasonably accommodated, [i]mproperly restored[] . . . .").)[7] And Plaintiff's EEO Complaint also alleges that she was denied "[]reasonable accommodations" and given an "improper restoration." (2011 EEO Complaint at D0098; *see also* Cowart Decl. Ex. 1 at D0270 (EEO Acknowledgement of Amendment to Complaint listing as issue for EEO review that "[o]n September 28, 2010, and continuing, [Plaintiff] was denied reasonable accommodation").) Accordingly, the Court construes Plaintiff's argument to be that USPS discriminated against her on the basis of her disability by failing to afford her a reasonable accommodation of her disability.

"The ADA . . . require[s] an employer to afford reasonable accommodation of an employee's known disability unless the accommodation would impose undue hardship on the employer." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A)); *see also Verdi*, 2010 WL 502959, at *4 (same). To make out a prima facie case of disability discrimination resulting from a failure to provide a reasonable accommodation, a plaintiff must show: "(1) [s]he is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Noll*, 787 F.3d at 94 (alteration omitted) (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009)); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)

---

[7] Citations to Plaintiff's Complaint are to the ECF-generated numbers on the top of each page.

(same). Although it is true that the "reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder, . . . in a case . . . in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll*, 787 F.3d at 94 (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996))); *see also Wright v. N.Y. State Dep't of Corr.*, — F.3d —, 2016 WL 4056036, at *4 (2d Cir. July 29, 2016) ("Determining the reasonableness of an accommodation is a 'fact-specific' question that often must be resolved by a factfinder." (alteration and some internal quotation marks omitted)).

"A reasonable accommodation is one that 'enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (alterations in original) (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)); *see also Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 353 (S.D.N.Y. 2015) (same), *aff'd*, 648 F. App'x 38 (2d Cir. 2016); *Carter v. Potter*, No. 06-CV-3854, 2008 WL 1848639, at *5 (E.D.N.Y. Apr. 23, 2008) ("The Second Circuit has cautioned that 'though reasonable accommodation may include such adjustments as modification of physical facilities, work schedules, or equipment, or some job restructuring, reasonable accommodation does not mean elimination of any of the job's essential functions.'" (some internal quotation marks omitted) (quoting *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991))). Importantly, the accommodation "must be effective," and need not be a "perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95.

Defendant contends that the Modified Assignment was "plainly reasonable" because it allowed Plaintiff to perform the essential functions of her position as a city letter carrier. (*See*

Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 13 (Dkt. No. 82).)

Defendant submits that the essential functions of a letter carrier are "sorting and delivering mail

on a particular route." (*See id.* (citing Decl. of Patrick J. O'Connor ("O'Connor Decl.") ¶ 3 (Dkt.

No. 79)); *see also* Cowart Decl. Ex. 16 (USPS's listing of the duties of a city letter carrier

including "cas[ing] all classes of mail" and "deliver[ing] mail along a prescribed route").)

Plaintiff proffers no evidence to the contrary.[8]  Her Modified Assignment did not alter the

essential functions of her previous city letter carrier assignment.  Rather, the Modified

Assignment kept Plaintiff as a city letter carrier and the offer expressly conveyed that her duties

were to include "Carrier Street Duties" and "delivery of mail."  (Cowart Decl. Ex. 36 at D0986.)

Indeed, her Modified Assignment was made up of the very same duties as her previous

assignment, with the only difference being that she was "assigned to an auxiliary route," which is

"one in which the assigned letter carrier is expected to case and deliver the mail in less than eight

hours," and which is commonly assigned to "letter carriers who are unable to work a full [eight]-

hour day such as . . . carriers with physical limitations."  (O'Connor Decl. ¶ 5.)

Moreover, the Modified Assignment was directly tailored to the physical limitations

identified in the medical evaluation of Plaintiff, which stated that Plaintiff could only work four

to six hours a day; could not push, pull, or lift more than 25 pounds; needed breaks of up to 15

minutes every two to three hours; and could likely serve as a letter carrier "with a pullcart for

four hours per day."  (*See* Medical Evaluation.)  The Modified Assignment provided for a four-

hour work day; a rest break lasting 15 minutes every two to three hours; no lifting, pushing, or

pulling over 25 pounds; and the use of a push cart for delivery.  (*See* Cowart Decl. Ex. 36 at

---

[8] Indeed, in her EEO Affidavit, Plaintiff described the duties in much the same way.  (*See* Pl.'s EEO Aff. at D0282 (describing the core duties of her letter carrier position as "[t]o deliver the mail" and "sort mail, hold mail, forward mail, return to sender mail").)

D0986.)  Accordingly, as a matter of law, USPS provided Plaintiff with a reasonable accommodation.  *See, e.g.*, *Muhammad v. Wal-Mart Stores E., L.P.*, No. 10-CV-6074, 2012 WL 3201668, at *9 (W.D.N.Y. Aug. 2, 2012) (holding that, as a matter of law, the defendant provided a reasonable accommodation where the new assignment "did not violate [the plaintiff's] doctor's restrictions"), *aff'd*, 532 F. App'x 21 (2d Cir. 2013); *Bielski v. Green*, 674 F. Supp. 2d 414, 425 (W.D.N.Y. 2009) (finding that the defendant provided the plaintiff-employee with a reasonable accommodation because the proposed assignment was consistent with the doctors' recommendations).

Plaintiff does not argue that the Modified Assignment prevented her from carrying out the essential functions of her job as a letter carrier.  Rather, she admits that the Offer of Modified Assignment did "accommodate [her] medical condition."  (Pl.'s EEO Aff. at D0290; *see also* Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)  Plaintiff's challenge to the Modified Assignment is that it did not accommodate her "seniority" or her "abilities."  (Pl.'s EEO Aff. at D0290.)  To the extent Plaintiff argues that she was entitled to her pre-injury route, the argument must be rejected because "[a]ll that is required" for a reasonable accommodation "is effectiveness," and USPS was "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee."  *Noll*, 787 F.3d at 95; *see also Atencio v. U.S. Postal Serv.*, — F. Supp. 3d —, 2016 WL 4145930, at *10 (S.D.N.Y. Aug. 4, 2016) (same).[9]  The Court thus grants summary judgment in favor of Defendant on Plaintiff's claim for disability discrimination based on Defendant's failure to provide a reasonable accommodation.[10]

---

[9] Moreover, Plaintiff has offered no evidence that she could do her prior work given her injury.

[10] Plaintiff's EEO Affidavit hints that USPS did not seek her input as to various alternative accommodations.  (*See, e.g.*, Pl.'s EEO Aff. at D0288 ("[A]n alternative was given[,] not suggested.").)  However, to the extent Plaintiff complains that USPS determined her

2.  Race, Sex, and National Origin Discrimination Claims[11]

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-2(a)(1).  To prevail on such a claim under Title VII in the absence of direct evidence of discrimination, a plaintiff usually must satisfy the *McDonnell Douglas* three-part burden-shifting test.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).[12]

Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a prima facie case of discrimination.  *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  To state a prima facie case of discrimination, a plaintiff "must show: (1) that [she] belonged to a protected class; (2) that [she] was qualified for the position [she] held; (3) that [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Dickens v. Hudson Sheraton*

---

modified assignment without her input, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable."  *Noll*, 787 F.3d at 98; *see also Atencio*, 2016 WL 4145930, at *10 ("[T]he interactive process is not required when the end it is designed to serve—reasonable accommodation—has already been achieved." (quoting *Noll*, 787 F.3d at 98)).

[11] Although Plaintiff's Complaint does not check the box for "color" discrimination, the Court notes that she did fill in the corresponding line.  (*See* Compl. 4.)  The Court construes the Complaint as raising such a claim, which fails for the same reasons as the race, sex, and national origin discrimination claims.

[12] "Where there is direct evidence that race was the motivating factor, 'the McDonnell Douglas search for a motive is unnecessary and therefore inapplicable.'"  *Patrolmen's Benevolent Ass'n v. City of N.Y.*, 74 F. Supp. 2d 321, 333 (S.D.N.Y.1999) (quoting *Johnson v. New York*, 49 F.3d 75, 79 (2d Cir. 1995)).

*Corp., LLC*, — F. Supp. 3d —, 2016 WL 825684, at *12 (S.D.N.Y. Mar. 1, 2016) (same).  If the plaintiff states a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action."  *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Abdu–Brisson*, 239 F.3d at 468 (same).  "If such a reason is provided, [the] plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination."  *Holcomb*, 521 F.3d at 138; *see also Abdu-Brisson*, 239 F.3d at 469 ("Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory.").

Plaintiff's various filings can be construed as asserting the following adverse employment actions:  (1) O'Connor's refusal to reinstate Plaintiff to her pre-injury route; (2) Cobelli's refusal to provide the Good Standing Letter; and (3) Plaintiff's termination of employment.  (*See, e.g.*, Cowart Decl. Ex. 1 at D0269–D0270.)  Defendant focuses on the fourth element of the prima facie case, arguing that Plaintiff has provided no evidence that any adverse action occurred under circumstances giving rise to an inference of discrimination on the basis of her race, sex, or national origin.  (*See* Def.'s Mem. 15–16.)  Moreover, Defendant contends that even if Plaintiff has made a prima facie showing, she cannot rebut USPS's legitimate, non-discriminatory reasons for each employment action.  (*See id.* at 16–18.)  Defendant is correct on both points.

An inference of discrimination can be derived from circumstances "including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015); *see also Szewczyk v. City of N.Y.*, No. 15-CV-918, 2016 WL 3920216, at *5 (E.D.N.Y. July 14, 2016) (same).

Put simply, Plaintiff points to no evidence that any of the three alleged adverse employment actions described above were in any way motivated by discriminatory intent on the basis of Plaintiff's race, sex, or national origin.  Plaintiff provides no evidence of any race, sex, or national origin-related discriminatory comments made by O'Connor, Cobelli, or any other USPS supervisor or co-worker directed at either Plaintiff or others in her protected groups.  *See, e.g.*, *Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2006 WL 345853, at *5 (S.D.N.Y. Feb. 14, 2006) ("Plaintiff does not point to a single degrading remark made during her employment based on gender, race, or national origin.").  In response to the question in her EEO Affidavit as to why she believed race was the reason behind the refusal to provide a Good Standing Letter, she conclusorily answered that "because of my race[,] management did not feel that I am entitled to on the job injury compensation."  (Pl.'s EEO Aff. at D0296.)  She provided the same answer with respect to her sex and color.  (*Id.*)  She provided similarly conclusory responses to the same question with respect to her denial of her request for her pre-injury route.  (*See id.* at D0290–D0291 (answering that "[b]ecause of my race[,] it was felt that I was not entitled to compensation despite decision made by OWCP," and "[r]emoving me from regular station[,]

route[,] [and] time makes it appear that I'm back at work but not consistent" and providing same answer for gender and color).)

The Court notes that the various filings cobbled together as Plaintiff's Complaint do contain a document entitled "The Conspiracy [W]ithin The United States Post Office To Enslave, Degrade, Discourage Minorities and Retire the Majorities," which alleges that there are "differences in the way [minorities] were being treated." (Compl. 10.) Plaintiff further alleges that "majorities were able to choose their assignments [and] overtime," while minorities were given explicit instructions with respect to what mail had to be delivered and when. (*Id.*) But, "[w]ithout factual amplification, the generic allegation of disparate treatment related to an unspecified class of Caucasian persons is simply not sufficient" to allow for an inference of discrimination. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 358 (S.D.N.Y. 2006) ("Evidence of disparate treatment cannot be based on conclusory allegations."); *Chan*, 2006 WL 345853, at *5 (finding that the plaintiff failed to provide any evidence raising an inference of discrimination where she offered "only conclusory statements such as: 'Caucasians were not denied formal orientation and training,' and 'my Caucasian peers . . . enjoyed computer facilities as soon as they were hired'" (alteration omitted)).

Further, Plaintiff's brief reference to three other employees who allegedly requested a reasonable accommodation and were assigned to their pre-injury routes is also insufficient. (*See* Pl.'s EEO Aff. at D0292–D0293.) First, of the three co-workers, one is a woman and one is black. (*See id.* at D0292.) Generally, evidence that employers treated a plaintiff less favorably than other employees in the plaintiff's own protected classes undermines any inference of discrimination on the basis of the shared characteristics. *See Henny v. N.Y. State*, 842 F. Supp.

2d 530, 555 n.24 (S.D.N.Y. 2012) (evidence that other African-American employees had significant number of absences but were not terminated "undermine[s] any inference that [the] [d]efendants [terminated the plaintiff's employment] based on discriminatory animus against African-Americans" (emphasis omitted)); *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 426 n.7 (S.D.N.Y.) (colleting cases), *aff'd*, 201 F.3d 430 (2d Cir. 1999).  Moreover, "[w]hen considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, [the Second Circuit has] said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself," *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted), a showing Plaintiff has failed to make.  Critically, Plaintiff provides zero details about the comparators' physical restrictions and how the restrictions did or did not affect their ability to return to their prior route.  Ultimately, because Plaintiff does not point to any evidence from which an inference of discriminatory motive can be drawn for any of the complained of actions, Plaintiff has failed to state a prima facie claim of discrimination and her Title VII discrimination claims are dismissed.

Even if Plaintiff stated a prima facie claim for discrimination, Defendant has provided a number of legitimate, non-discriminatory reasons for each of the three employment actions. With respect to the Good Standing Letter, Cobelli has stated that there were three independent reasons why he would not provide such a letter.  First, Plaintiff provided insufficient information as to the purpose of the Letter and the intended recipients.  (Cobelli Decl. ¶¶ 2–4.)  According to Cobelli, in his experience, when employees ask him to provide certain employment information to third-parties, "invariably the information being requested was identified in a pre-printed, official form of some kind such as those from the Department of Labor or an insurance

company." (*Id.* ¶ 3.)  Those official forms would "identif[y] to whom the information would be provided, the purpose, and the type of information being sought." (*Id.* ¶ 4.)  Such information is critical given employee privacy concerns—Postal Service managers may only disclose limited information to third-parties concerning an employee.  (*Id.*)  Plaintiff does not proffer any evidence that she provided additional information to Cobelli so as to assuage these concerns. (*See* Pl. Opp'n 56.1 ¶ 14; *see also* Pl.'s EEO Aff. at D0294.)  Second, Cobelli did not provide the Good Standing Letter because he was not authorized to make a "qualitative assessment of an employee such as, for example, he or she is a 'good' or 'honest' employee" and the Postal Service "does not categorize employees as being in 'good standing.'"  (Cobelli Decl. ¶ 5.)  Third, Cobelli averred that he did not provide the Good Standing Letter because Plaintiff had poor attendance in the two weeks prior to her making the request and, as such, was subject to discipline for violating USPS rules on work attendance and leave authorization.  (*Id.* ¶ 6; *see also* Cowart Decl. Ex. 37 at D0531; Pl.'s 56.1 ¶ 12.)  These are all neutral and legitimate reasons for Cobelli to decline to write the Good Standing Letter.

Regarding Plaintiff's termination, there were at least four workplace incidents during which Plaintiff engaged in hostile behavior that required the intervention of police.  (*See* Def.'s 56.1 ¶¶ 13–16, 18, 20–26; Pl.'s 56.1 ¶¶ 13–16, 18, 20–26.)  During these incidents, Plaintiff yelled and screamed at Cobelli and O'Connor and refused to listen to their instructions.  (*See, e.g.*, Def.'s 56.1 ¶¶ 15, 20, 23; Pl. 56.1 ¶¶ 15, 20, 23.)  The Notice of Removal expressly refers to two of the incidents, and details how Plaintiff's conduct during each incident violated a number of rules in USPS's Employee & Labor Relations Manual and Westchester District policy regarding violence in the workplace.  (*See generally* Cowart Decl. Ex. 21.)  Indeed, Plaintiff's conduct was so threatening that police officers were summoned to the scene *four times*.  (*See,*

19

*e.g.*, Def.'s 56.1 ¶¶ 23–26; Pl.'s 56.1 ¶¶ 23–26.)  Such incidents are undoubtedly sufficient nondiscriminatory reasons for Plaintiff's termination, as it is well settled that "[e]mployee misconduct is a legitimate, nondiscriminatory reason for the termination of employment." *Rolon v. Pep Boys—Manny, Moe & Jack*, 601 F. Supp. 2d 464, 469 (D. Conn. 2009) (internal quotation marks omitted); *Cordell v. Verizon Wireless*, 550 F. Supp. 2d 400, 403 (W.D.N.Y. 2008) (same), *aff'd sub nom. Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x 56 (2d Cir. 2009); *see also Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 318 (E.D.N.Y. 2012) (explaining that a "pattern of unprofessional conduct . . . is a legitimate justification for termination" (internal quotation marks omitted)).  Moreover, Plaintiff had been continually absent without approved leave from November 20, 2010 to March 10, 2011, (*see* Def.'s 56.1 ¶¶ 12, 17, 19; Pl.'s 56.1 ¶¶ 12, 17, 19; *see also* Cowart Decl. Ex. 37 at D0528, D0531), which provided an additional legitimate nondiscriminatory reason for Plaintiff's termination, *see, e.g., Basso v. Potter*, 596 F. Supp. 2d 324, 334 (D. Conn. 2009) ("Unauthorized absences may constitute a legitimate and nondiscriminatory reason for termination."); *Rollins v. N.Y.C. Dep't of Educ.*, No. 05-CV-10482, 2008 WL 2736018, at *4 (S.D.N.Y. July 8, 2008) (finding that the defendants "clearly demonstrated non-discriminatory reasons for [the] plaintiff's termination" where she was "ultimately terminated for taking an improper leave of absence, despite the denial of her request, and for failing to return to work after notice was sent to her").

Finally, regarding Plaintiff's complaint about her assignment to a different route, Defendant has submitted evidence that Plaintiff's physical restrictions prevented her from returning to her pre-injury route.  Specifically, O'Connor avers that Plaintiff's "medical limitations prevented her from completing her pre-injury bid assignment within the required route time period" and that "the modified assignment offered to her was the only work available

which was within her medical restrictions and limitations." (O'Connor Decl. ¶ 5.) This was the case because the auxiliary route assigned to Plaintiff contained apartment buildings which allowed her to use a push cart and complete the route within four hours, both of which were required due to her medical condition. (*Id.*; *see also* Medical Evaluation at D0661 (concluding that Plaintiff could "be tried as a mail carrier with a pullcart for four hours per day").) Further, O'Connor declared more generally that he is responsible for attempting to locate suitable work for employees who suffered from job-related disabilities and that "[s]uitable work may include assignments to stations and routes outside of these employees' . . . pre-injury work shift, postal station[,] and work assignment." (O'Connor Decl. ¶ 4.) Plaintiff's physical restrictions that prevented her from adequately carrying out the duties associated with her pre-injury route upon her return to work were a legitimate nondiscriminatory reason for refusing to assign her to that route. *See, e.g.*, *Stroud v. New York City*, 374 F. Supp. 2d 341, 352 (S.D.N.Y. 2005) (finding that the defendant "amply demonstrated legitimate reasons for taking adverse employment actions" against the plaintiff where, among other things, the defendant pointed to "generally applicable policies setting forth . . . job restrictions for employees who have physical limitations").

Because Defendant has articulated legitimate reasons for the adverse employment actions, the presumption of discrimination raised by the prima facie case disappears, and Plaintiff must demonstrate pretext. *Holcomb*, 521 F.3d at 138. But "Plaintiff has presented no evidence of pretext except for her own beliefs that [D]efendants were motivated by discrimination[,] [which] fails to establish pretext as a matter of law." *Rollins*, 2008 WL 2736018, at *5; *see also* *Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 375 (E.D.N.Y. 2015) ("Conclusory allegations of discrimination are insufficient to show that a defendant's non-discriminatory

reasons are pretexts and avoid summary judgment."), *aff'd*, 639 F. App'x 50 (2d Cir. 2016). To the extent Plaintiff seeks to rely on the statement in her EEO Affidavit that another letter carrier named George received a similar "good standing" letter upon his request, (*see* Pl.'s EEO Aff. at D0298), the argument falls flat. Plaintiff's EEO Affidavit states that George sought to have a "Ca-7 form for compensation" filled out. (*Id.*) Plaintiff provides no evidence that such a form was in any way similar to the Good Standing Letter sought by Plaintiff. Further, there is no evidence that George's record suffered from the same serious issues plaguing Plaintiff's, namely the string of unexcused absences. And with respect to the denial of her request to be assigned to her pre-injury route, Plaintiff does not, for example, provide evidence that she was actually physically capable of performing that route, and does not amplify her vague references to three alleged comparators; she does not provide evidence that any of the three were similarly physically incapable of performing their pre-injury route but were assigned to it anyway.[13]

Accordingly, no reasonable juror could conclude that any of Plaintiff's purported comparators is similarly situated to Plaintiff, and Plaintiff is left with no evidence of pretext. As such, Defendant is entitled to summary judgment on Plaintiff's Title VII discrimination claims.[14]

---

[13] Indeed, based on evidence provided by Defendant, it appears that at least one of the purported comparators—George—was cleared by his doctor to return to "regular duties" before he was re-instated to his original route. (*See* Cowart Decl. Ex. 27 at D0797, D0806.)

[14] The Court notes that it is unclear as to whether Plaintiff also argues that the adverse employment actions were motivated by discrimination based on her *disability*, in addition to her race, sex, and national origin. *See, e.g.*, *Verdi*, 2010 WL 502959, at *4 (noting that the Rehabilitation Act "incorporates the remedies, procedures and rights set forth in Title VII" and that "[c]laims of discrimination under the ADA include . . . adverse actions on the basis of disability" (internal quotation marks omitted)). Such a claim would be subject to the same *McDonnell Douglas* burden-shifting analysis as the claims for race, sex, and national original discrimination. *See id.* Plaintiff's claim would fail for the same reasons described above; she did not provide any evidence that the adverse employment actions were discriminatory on the basis of her disability, and, even if she did, Defendant provided legitimate, nondiscriminatory reasons for USPS's actions.

22

### 3.  Retaliation Claim

Title VII prohibits discrimination against an employee "because he [or she] has opposed any practice made an unlawful employment practice."  42 U.S.C. § 2000e–3(a).  Courts analyze claims for retaliation pursuant to Title VII under the three-part *McDonnell Douglas* framework set forth above.  *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal . . . retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas* . . . .").  The plaintiff establishes a prima facie case of retaliation by showing:  (1) "participation in a protected activity"; (2) "the defendant's knowledge of the protected activity"; (3) "an adverse employment action"; and (4) "a causal connection between the protected activity and the adverse employment action."  *Kwan*, 737 F.3d at 844 (internal quotation marks omitted).

Defendant's Motion focuses on the causation element, arguing that Plaintiff "points to no admissible direct evidence of USPS officials taking the challenged actions because of her prior EEO activity."  (*See* Def.'s Mem. 18–19.)  The Court agrees.

A plaintiff can show the necessary causal connection one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Richardson v. Bronx Lebanon Hosp.*, No. 11-CV-9095, 2014 WL 4386731, at *12 (S.D.N.Y. Sept. 5, 2014) (same); *Weber v. City of N.Y*, 973 F. Supp. 2d 227, 270 (E.D.N.Y. 2013) (same).  Plaintiff has not provided any evidence from which direct retaliatory animus may be reasonably inferred.  She also does not include any evidence of other similarly situated employees who engaged in similar protected conduct but were treated differently.  Plaintiff's

response to the question in her EEO Affidavit that asked her to explain why she believed Defendant refused to give her the Good Standing Letter because of her prior EEO activity is particularly telling.  She answered "same as above"—meaning the same as her answer to the questions asking her why she believed that refusal to give her the Good Standing Letter was based on her race, color, and sex.  (Pl.'s EEO Aff. at D0296.)  Accordingly, without any direct evidence or evidence of disparate treatment, Plaintiff can only rely on a temporal connection between the protected activity and adverse employment actions.[15]

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can be sufficient to establish causation.").  However, Plaintiff's protected EEO activity occurred in 2008, (*see* Cowart Decl. Ex. 15 at D0648), and the allegedly adverse actions occurred in 2010 and 2011.  Although the Second Circuit "ha[s] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [a protected activity] and an allegedly retaliatory activity," *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (internal quotation marks omitted), the temporal proximity must be "very close," and a lapse of as much as "20 months . . .

---

[15] To the extent Plaintiff asserts that the allegation in her Complaint that Cobelli stated "that he is not going to let me get away with the stunts I pulled before," (Compl. 8), is evidence of retaliatory animus, that one ambiguous comment, made at some unspecified time (but seemingly years after her protected activity), is insufficient to make even a prima facie showing of a causal connection.  *Cf. Gorham v. Town of Trumball*, 7 F. Supp. 3d 218, 234 (D. Conn. 2014) ("A single, racially-neutral comment cannot give rise to an inference of discrimination based on race or color.").

suggests, by itself, no causality at all," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74

(2001) (internal quotation marks omitted); *see also Harper v. Brooklyn Children's Ctr.*, No. 12-

CV-4545, 2014 WL 1154056, at *5 (E.D.N.Y. Mar. 20, 2014) ("[T]he approximately two years

between [the] plaintiff's 2007 federal action and [the] defendant's alleged retaliation in 2009 do

not support an inference of retaliation because they lack temporal proximity." (internal quotation

marks omitted)); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of

retaliation are routinely dismissed when as few as three months elapse between the protected

EEO activity and the alleged act of retaliation.  Surely, two-and-one half years is far too long to

warrant an inference of discriminatory retaliation." (citations omitted)).  Accordingly, because

Plaintiff relies solely on the temporal proximity of her protected activity and the adverse

employment actions, but roughly two years had passed between the activity and the alleged

retaliation, Plaintiff has not established a prima facie case of retaliation.  In any event, as

discussed above, Defendant has proffered legitimate, non-discriminatory reasons for the

challenged actions and Plaintiff has no evidence of causation sufficient to show pretext.  Thus,

even if Plaintiff satisfied the prima facie case requirements, Defendant would still be entitled to

summary judgment on Plaintiff's retaliation claim.[16]

---

[16] This conclusion would require dismissal of Plaintiff's retaliation claim even if it is
construed as also asserting that the Notice of Removal, dated April 26, 2011, was issued as
retaliation for her filing of the EEO Complaint underlying this Action, on April 18, 2011.  *See El
Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of
events may give rise to an inference of retaliation for the purposes of establishing a prima facie
case of retaliation under Title VII, but without more, such temporal proximity is insufficient to
satisfy [a plaintiff's] burden to bring forward some evidence of pretext.").

### III. Conclusion

In light of the foregoing, the Court grants Defendant's Motion for Summary Judgment in its entirety. The Clerk of Court is respectfully directed to terminate the pending motion. (Dkt. No. 78.)[17]

SO ORDERED.

Dated:     September 30, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[17] The Court notes that many of Plaintiff's submissions filed throughout this Action refer to her failed efforts to have a "ca-7" form properly filled out by USPS. (*See, e.g.*, Compl. 7 (discussing her efforts to "get forms ca-7 and ca-7a signed by supervisors"); *id.* at 11.) She also sporadically refers to a white co-worker, "George," who allegedly had his "ca-7" forms properly filled out. (*See, e.g., id.* at 7 ("I have witness[ed] another carrier George come in and submit his form[] CA-7 . . . which was signed and submitted and pa[i]d on . . . .").) A properly filled out "ca-7" form appears to have been necessary for Plaintiff to receive certain workers' compensation benefits. (*See, e.g., id.* at 11 ("I have not received any payments from worker's comp[ensation] because the majorities . . . have been sitting on my fo[r]ms for payment . . . ." (emphasis omitted)); *id.* at 30 ("[I] still have not received payment for period of September 21, 2010–November 3, 2010." (emphasis omitted)).)

Although Defendant's motion papers do not construe Plaintiff's filings to raise a discrimination claim based on this conduct, the Court, liberally construing Plaintiff's Complaint, does construe it to assert such a claim. (*Cf.* Cowart Decl. Ex. 3 at D0502 (EEO Investigative Affidavit asking O'Connor for information about George because "[t]he Complainant alleges that Carrier George has been treated more favorably in that management has processed his requests for employment related paperwork (e.g. CA-7 forms) upon his verbal request and in a timely manner.") Accordingly, if so desired, Defendant may file an additional motion for summary judgment within 20 days of the date of this Opinion addressing the claim, including, to the extent relevant, whether the claim is exhausted and the merits of the claim. Plaintiff will have 20 days to respond to any such motion.

26